NMA:NS
F. #2013R00786

MISC 13    866

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IRIZARRY, J.

- - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION
OF THE UNITED STATES OF AMERICA
FOR ORDERS AUTHORIZING THE
DISCLOSURE OF LOCATION DATA
RELATING TO FOUR SPECIFIED
WIRELESS TELEPHONES

**FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
APPLICATION
(Fed. R. Crim. P. 41; T. 18, U.S.C.,
§§ 2703(c)(1)(A), 3103a and 3117;
T. 28, U.S.C., § 1651(a))

- - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

I, SEAN OLSEWSKI, being first duly sworn, hereby depose and state as

follows:

1.      I make this affidavit in support of an application for search warrants

under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information

about the location of (1) the cellular telephone assigned call number (571) 337-7018,

subscribed to by REDINEL DERVISHAJ, Dummy, Dummy, No City, New York 11102

("SUBJECT TELEPHONE 1"), whose wireless telephone service provider is T-Mobile;

(2) (347) 392-0246, subscribed to by BESNIK LLAKATURA, 186 Jefferson Avenue, Staten

Island, New York 10306 ("SUBJECT TELEPHONE 2"), whose wireless service provider is

Sprint; (3) (516) 423-1788, subscribed to by DENIS NIKOLLA, 161 Utica Avenue,

Apartment 2G, Brooklyn, New York 11213, whose wireless service provider is Sprint

("SUBJECT TELEPHONE 3"); and (4) (917) 346-3581, subscribed to by VASILIKIA

VJERI, 3270 Steinway Street, Astoria, New York 11103-4006 ("SUBJECT TELEPHONE 4"), whose wireless service provider is MetroPCS Wireless, Inc. (collectively, the "SUBJECT TELEPHONES"). T-Mobile, Sprint and MetroPCS Wireless, Inc., are collectively referred to as the "Service Providers." The SUBJECT TELEPHONES are described herein and in Attachments A-1, A-2, and A-3 to the respective search warrants, and the location information to be seized is described herein and Attachments B-1, B-2 and B-3 to the respective search warrants. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately ten years. I am currently assigned to Squad C-42, where I investigate emerging organized crime groups, including Albanian organized crime enterprises, engaged in extortion, violent robberies, loansharking, and other offenses. These investigations are conducted both in an undercover and overt capacity. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Because the purpose of this affidavit is limited to demonstrating probable cause for the requested warrant, it does not set forth all of my knowledge about this matter. In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

2

4.      Based on the facts set forth in this affidavit, there is probable cause to

believe that extortion and conspiracy to commit extortion, in violation of 18 U.S.C. § 1951

have been committed, and are being committed, by REDINEL DERVISHAJ, BESNIK

LLAKATURA, DENIS NIKOLLA, VASILIKIA VJERI and others known and unknown in

the Eastern District of New York and elsewhere.   There is also probable cause to believe that

REDINEL DERVISHAJ has used, and is currently using, SUBJECT TELEPHONE 1 to

engage in and facilitate extortion and conspiracy to commit extortion, that BESNIK

LLAKATURA has used, and is currently using, SUBJECT TELEPHONE 2 to engage in and

facilitate extortion and conspiracy to commit extortion, that DENIS NIKOLLA has used, and

is currently using, SUBJECT TELEPHONE 3 to engage in and facilitate extortion and

conspiracy to commit extortion, and that VASILIKIA VJERI has used, and is currently using,

SUBJECT TELEPHONE 4 to engage in and facilitate extortion and conspiracy to commit

extortion.   There is therefore probable cause to believe that the location information,

including but not limited to E-911 Phase II data (or other precise location information)

concerning the SUBJECT TELEPHONES (the "REQUESTED INFORMATION"),[1] as

described in Attachments B-1, B-2 and B-3, will constitute evidence of these criminal

---

[1]      Such information shall, where other information is unavailable, include records
reflecting the tower and antenna face ("cell site") used by the SUBJECT TELEPHONE at the
start and end of any call or text message transmission.   In requesting cell site information, the
government does not concede that such cell site records — routinely retained by wireless
carriers as business records — may only be obtained via a warrant issued on probable cause.
*See In re Application*, 632 F. Supp. 2d 202 (E.D.N.Y. 2008) (authorizing prospective
acquisition of cell-site records under combined authority of 18 U.S.C. 2703(d) & 3121 *et seq.*);
*In re Application*, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (same).

violations, and will lead to the identification of individuals who are engaged in the commission

of these offenses, as well as victims of these offenses.

## PROBABLE CAUSE

5.     The FBI has been investigating an extortion conspiracy involving

REDINEL DERVISHAJ, BESNIK LLAKATURA, DENIS NIKOLLA, VASILIKIA VJERI

and others.   The investigation began in May 2013 following receipt of information from John

Doe #1, a victim of the extortion conspiracy who reported threats he received to law

enforcement, and whose identity is known to your affiant.   Following receipt of information

from John Doe #1, the FBI has used various investigative techniques to further the

investigation, including (as described below) the use of court-authorized wiretaps of

SUBJECT TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3.

The investigation has revealed that DERVISHAJ, LLAKATURA, NIKOLLA and VJERI use

the SUBJECT TELEPHONES to facilitate extortion activities involving John Doe #1 and

other extortion victims.[2]

6.     During the course of the investigation, the following orders pertaining to

the SUBJECT TELEPHONES have been obtained.   On July 11, 2013, the Honorable Ramon

E. Reyes, Jr., United States Magistrate Judge, signed an order authorizing a pen register and

trap and trace device on SUBJECT TELEPHONE 2 for a period of 60 days.   (13 MISC 529).

On July 12, 2013, the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge, signed

---

[2]     Because the purpose of this affidavit is to set forth only those facts necessary to
establish probable cause for the requested warrants, I have no described all of the relevant facts
and circumstances of which I am aware.

4

an order authorizing a pen register and trap and trace device on SUBJECT TELEPHONE 1 for

a period of 60 days. (13 MISC 532). On July 16, 2013, the Honorable Cheryl M. Pollak,

United States Magistrate Judge, signed an order authorizing the release of historical cell-site

information for SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 for the period

from May 1, 2013 to July 16, 2013. (13 MISC 539). On July 16, 2013, the Honorable Cheryl

M. Pollak, United States Magistrate Judge, signed an Order authorizing the disclosure of

location data for SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 for a period of 30

days. (13 MISC 540). On August 6, 2013, the Honorable Dora L. Irizarry, United States

District Judge for the Eastern District of New York, authorized the interception of wire and

electronic communications and the disclosure of geographic location information over

SUBJECT TELEPHONE 1 for a period of 30 days. (13 MISC 0618 (DLI)). Interceptions

pursuant to the August 6, 2013 Order ceased on September 5, 2013. On August 21, 2013, the

Honorable Vera M. Scanlon, United States Magistrate Judge, signed an order authorizing pen

registers and trap and trace devices on, inter alia, SUBJECT TELEPHONE 3 for a period of 60

days. (13 MISC 682). On August 22, 2013, the Honorable Vera M. Scanlon, United States

Magistrate Judge, signed an order authorizing the disclosure of location data for, inter alia,

SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 for a period of 30 days. (13

MISC 684). On September 10, 2013, the Honorable Steven M. Gold, Chief United States

Magistrate Judge, signed an order authorizing the disclosure of location data for SUBJECT

TELEPHONE 1 for a period of 30 days. (13 MISC 737). On September 11, 2013, the

Honorable Steven M. Gold, Chief United States Magistrate Judge, signed an order authorizing

pen register and trap and trace devices on SUBJECT TELEPHONE 1 and SUBJECT

TELEPHONE 2 for a period of 60 days.   (13 MISC 740).   On September 16, 2013, the

Honorable Dora L. Irizarry, United States District Judge for the Eastern District of New York,

reauthorized the interception of wire and electronic communications and the disclosure of

geographic location information over SUBJECT TELEPHONE 1, authorized the interception

of wire and electronic communications and the disclosure of geographic location information

over SUBJECT TELEPHONE 2, and authorized the interception of wire communications and

the disclosure of geographic location information over SUBJECT TELEPHONE 3 for a period

of 30 days.   (13 MISC 0618 (DLI)).   On October 16, 2013, the Honorable Robert M. Levy,

United States Magistrate Judge, signed an order authorizing a pen register and trap and trace

device on, inter alia, SUBJECT TELEPHONE 4 for a period of 60 days.   (13 MISC 849).

       7.     Certain of the communications intercepted over SUBJECT

TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 pursuant to

Court-authorized wiretaps, most of which were in Albanian, are summarized and described

below.   All quotations and summaries of intercepted communications are based on line sheets

and draft translations and summaries, not final transcripts.   All dates and times set forth herein

of these communications are approximate and based on the monitoring equipment at the time

the calls and texts were intercepted.

EXTORTION OF JOHN DOE #1

       8.     John Doe #1 immigrated to the United States from Albania

approximately ten years ago.   John Doe #1 owns a pizzeria in Little Neck, New York

(hereinafter, the "Queens Pizzeria") and a seafood restaurant in Astoria, New York

(hereinafter, the "Astoria Restaurant").  John Doe #1 has advised the following, in substance

and in part:

           a.      On or about the afternoon of May 11, 2013, an employee of the

Queens Pizzeria informed John Doe #1 that a man had entered the Queens Pizzeria and asked

to speak with John Doe #1.  John Doe #1 subsequently entered the dining area of the Queens

Pizzeria and spoke with the man, an Albanian male, who introduced himself as "REDINEL

DERVISHAJ."  During their conversation, DERVISHAJ stated that (1) John Doe #1 would

have to pay DERVISHAJ $4,000 per month because John Doe #1 had recently opened the

Astoria Restaurant in "our neighborhood;" (2) if John Doe #1 did not know who DERVISHAJ

was, John Doe #1 should look DERVISHAJ up on the Internet;[3] (3) DERVISHAJ knew that

John Doe #1 had a brother who owned a liquor store in Massachusetts who "had lots of

money;" and (4) DERVISHAJ was going to send two men to the Astoria Restaurant that

evening and John Doe #1 needed "to take care of them."

           b.      Following this encounter, on or about May 11, 2013, John Doe #1

called SUBJECT TELEPHONE 2 and spoke with his friend, BESNIK LLAKATURA, a New

---

[3]    A "Google" search for "Redinel Dervishaj" results in articles from various media
outlets showing photographs of DERVISHAJ and revealing the following information
regarding DERVISHAJ's involvement in a fatal stabbing: According to the news articles, in or
about March 2012, DERVISHAJ was arrested for stabbing Antonio Lacertosa with a butcher
knife on Staten Island, New York, during Lacertosa's engagement party.  Lacertosa died from
his injuries.  In or about April 2012, a Staten Island grand jury declined to indict DERVISHAJ
for Lacertosa's murder, after viewing video surveillance footage of events leading up to the
stabbing, which DERVISHAJ's counsel argued showed DERVISHAJ acted in self-defense.

York City Police Department ("NYPD") officer of Albanian descent. LLAKATURA advised John Doe #1 that DERVISHAJ and others extort various Albanian establishments in Astoria and that John Doe #1 opened the Astoria Restaurant in "their neighborhood."

        c.      John Doe #1 has known BESNIK LLAKATURA for many years and previously lived with LLAKATURA. As a result, LLAKATURA knows personal details regarding John Doe #1, including John Doe #1's mobile telephone number and the fact that John Doe #1's brother-in-law lives in Massachusetts and owns a liquor store there.

        d.      On or about the evening of May 11, 2013, an employee of the Astoria Restaurant informed John Doe #1 that two men came to the Astoria Restaurant looking for John Doe #1 when John Doe #1 was not there. Thereafter, at approximately 10:41 p.m., John Doe #1 received a call on his mobile telephone from a telephone number with area code 718 (hereinafter, "718 Telephone Number 1").[4] According to John Doe #1, the person who called him from 718 Telephone Number 1 identified himself as "Redinel" and, in Albanian, reiterated that John Doe #1 had opened his restaurant in "our neighborhood" and, as a result, John Doe #1 would have to pay "us."

        e.      Prior to May 11, 2013, John Doe #1 had never met REDINEL DERVISHAJ. At no point during their May 11, 2013 encounter did John Doe #1 provide DERVISHAJ with his mobile telephone number.

---

[4]     Records checks reveal that 718 Telephone Number 1 belongs to a pay phone located in Astoria, New York.

9.    Video surveillance footage captured by security cameras installed within the Queens Pizzeria corroborates John Doe #1's account of what transpired on the afternoon of May 11, 2013.  The video surveillance footage shows a man entering the Queens Pizzeria at approximately 3:47 p.m.[5] and speaking with an employee behind the pizza counter.  The employee then walks away.  Approximately 25 seconds later, John Doe #1 enters the dining area from the back of the Queens Pizzeria and speaks with the man who had entered.  John Doe #1 and the man sit together at a table in the Queens Pizzeria for a short time, after which the man exits the Queens Pizzeria.  Telephone records also confirm that John Doe #1 called SUBJECT TELEPHONE 2 at approximately 3:53 p.m. on May 11, 2013.

10.    On or about March 23, 2013, DERVISHAJ was arrested in Queens, New York on a domestic violence charge.  According to the NYPD Domestic Incident Report, DERVISHAJ's phone number is SUBJECT TELEPHONE 1.  As noted above, SUBJECT TELEPHONE 1 is also subscribed to by REDINAL DERVISHAJ.  Telephone records reveal that SUBJECT TELEPHONE 2 was used to call SUBJECT TELEPHONE 1 at approximately 3:13 p.m. on May 11, 2013 – approximately 34 minutes _before_ DERVISHAJ visited the Queens Pizzeria on May 11, 2013 and approximately 40 minutes _before_ John Doe #1 called LLAKATURA to inform him of the extortion threats made by DERVISHAJ.  Telephone records also reveal that SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE

---

[5]    Analysis of the video surveillance footage from the Queens Pizzeria indicates that the time stamp from the footage is one hour behind the actual time (_i.e._, when the video footage indicates that it is 2:47 p.m., it is actually 3:47 p.m.).  Times set forth herein reflect the actual time.

9

2 on May 11, 2013, after DERVISHAJ's visit to the Queens Pizzeria, at the following
approximate times: 3:49 p.m., 5:58 p.m., 6:08 p.m., and 10:47 p.m.   Based on the timing of
the above-described calls, the information conveyed by DERVISHAJ to John Doe #1, and my
training, experience and participation in the investigation, I believe that LLAKATURA likely
knew of DERVISHAJ's plan to extort John Doe #1 prior to being informed by John Doe #1 of
DERVISHAJ's threats and, further, that LLAKATURA likely aided the extortion plan by
providing DERVISHAJ with (1) personal information regarding John Doe #1's
brother-in-law, which DERVISHAJ conveyed to John Doe #1 during the May 11, 2013
meeting; and/or (2) John Doe #1's mobile telephone number, which DERVISHAJ used to call
John Doe #1 from 718 Telephone Number 1 on the evening of May 11, 2013.   Based on my
participation in the investigation, and my training and experience, I further believe that
DERVISHAJ called LLAKATURA immediately following his May 11, 2013 meeting with
John Doe #1 and immediately following his 10:43 p.m. phone call to John Doe #1 to, inter alia,
convey to LLAKATURA what transpired during the meeting and phone call, respectively.

     11.    According to John Doe #1, on or about the evening of May 12, 2013,
John Doe #1 closed the Queens Pizzeria, got into his vehicle and began driving home.   As
John Doe #1 was driving, he noticed a white Chevy Malibu sedan (hereinafter, the "Chevy
Malibu") following his vehicle.   Thereafter, John Doe #1 observed DERVISHAJ get out of
the Chevy Malibu, knock on the front driver's side window of John Doe #1's vehicle and state
the following, in Albanian, in substance and in part: "What happened?   You think you're a
tough guy?   You think you have balls of steel?   I want $4,000 for the restaurant per month."

DERVISHAJ further stated that John Doe #1's restaurant was going to be a "gold mine" and that John Doe #1 had to pay "us." John Doe #1 reported the license plate number of the Chevy Malibu to law enforcement personnel. Records checks reveal that the Chevy Malibu is registered to DERVISHAJ at an address in Queens, New York. Telephone records reveal that (1) SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 1:56 p.m. and 5:20 p.m. on May 12, 2013; and (2) SUBJECT TELEPHONE 2 was used to call SUBJECT TELEPHONE 1 at approximately 8:29 p.m. on May 12, 2013.

   12. According to John Doe #1, on or about May 14, 2013, at approximately 8:30 p.m., John Doe #1 noticed the Chevy Malibu on the streets of Astoria, Queens. At approximately 10:30 p.m., John Doe #1 saw DERVISHAJ park the Chevy Malibu across the street from the Astoria Restaurant and walk towards the Astoria Restaurant. Thereafter, DERVISHAJ again demanded money from John Doe #1. John Doe #1 told DERVISHAJ that he was not making any money from the Astoria Restaurant, as he had not yet received his liquor license. DERVISHAJ nonetheless continued to demand payment, telling John Doe #1, in substance and in part, "you have to take care of us." Telephone records reveal that SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 8:04 p.m., 8:22 p.m., and 11:02 p.m. on May 14, 2013. Based on my training and experience, and the timing of these calls, I believe that DERVISHAJ called LLAKATURA to discuss the extortion of John Doe #1.

11

13.     Telephone records further reveal that between May 17, 2013 and July 3, 2013, SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 were in contact approximately 29 times.

14.     John Doe #1 has advised that he did not receive extortionate threats following the May 14, 2013 incident described above until in or about July 2013.   More specifically, John Doe #1 has advised the following, in substance and in part:

a.     On or about the evening of July 6, 2013, John Doe #1 closed up the Queens Pizzeria.  As John Doe #1 exited the Queens Pizzeria and proceeded towards his vehicle, which was parked in a driveway behind the Queens Pizzeria, John Doe #1 noticed a black Dodge Charger vehicle (hereinafter, the "Dodge Charger") also parked on a side street behind the Queens Pizzeria.

b.     John Doe #1 pulled out of the driveway and turned left onto the street, at which point he noticed at least three men inside the Dodge Charger.   Thereafter, the Dodge Charger began following John Doe #1's vehicle.   John Doe #1 noticed that the Dodge Charger did not have a front license plate.

c.     John Doe #1, who was driving on a narrow residential street, subsequently attempted to make a U-turn in an effort to see the Dodge Charger's rear license plate.   As John Doe #1 did so, his vehicle ended up nose-to-nose with the Dodge Charger, at which point John Doe #1 reversed his vehicle for approximately half a block and attempted to turn his vehicle around.   John Doe #1 was unable to turn his vehicle around, however, as his vehicle was too close to a street pole on the corner.   At this point, the driver of the Dodge

12

Charger exited the Dodge Charger carrying a gun, ran towards John Doe #1's vehicle, and pointed his gun at John Doe #1, while yelling at John Doe #1.  John Doe #1 managed to escape the area and drove away.

        d.     John Doe #1 has identified a photograph of DENIS NIKOLLA as the driver of the Dodge Charger who pointed a gun at John Doe #1 on July 6, 2013.

        15.     Video surveillance footage in and around the Queens Pizzeria shows that John Doe #1 closed the Queens Pizzeria on July 6, 2013 at approximately 11:27 p.m.   Video surveillance footage also shows that a black Dodge Charger drove by the Queens Pizzeria at approximately 9:47 p.m., and was outside the front entrance of the Queens Pizzeria from approximately 10:00 p.m. to 10:10 p.m.   Within the next hour, the video surveillance footage further shows a black Dodge Charger drive by the Queens Pizzeria several times onto a side street.   The black Dodge Charger captured by the video surveillance footage had no front license plate.

        16.     Records checks reveal that a black Dodge Charger is registered to DENIS NIKOLLA in Florida.   A check of the NYPD's Real-Time Crime Center License Plate Reader database indicates that the Dodge Charger registered to NIKOLLA has been captured on license plate reader cameras in New York City multiple times in July 2013.

        17.     According to John Doe #1, shortly after the above-described incident with the Dodge Charger, at approximately 12:23 a.m. on July 7, 2013, John Doe #1 received a phone call on his mobile telephone from DERVISHAJ, using a telephone number beginning

with area code 718 (hereinafter, "718 Telephone Number 2").[6]   According to John Doe #1,

DERVISHAJ informed John Doe #1,   in Albanian and in substance and in part, that

DERVISHAJ had not forgotten about John Doe #1, that he knew what was going on and that

John Doe #1 "got lucky this time."   Based on my participation in the investigation, and my

training and experience, I believe that DERVISHAJ's statement that John Doe #1 "got lucky

this time" was a reference to John Doe #1 having been able to escape unharmed, despite

NIKOLLA's having pointed a gun at him.

      18.     Telephone records indicate that (516) 423-3813 is a mobile telephone

issued by Sprint and subscribed to by DENIS NIKOLLA at 161 Utica Avenue, Apartment 2G,

Brooklyn, New York 11213 (hereinafter, the "NIKOLLA Cell Phone").   Telephone records

further show that on July 6, 2013 – the date that NIKOLLA displayed a gun to John Doe #1 –

the NIKOLLA Cell Phone was in contact with SUBJECT TELEPHONE 1 leading up to the

gun incident at the following approximate times: 2:49 p.m., 2:50 p.m., 3:04 p.m., 6:24 p.m.,

6:57 p.m., 7:31 p.m., and 8:36 p.m.   Telephone records also show that the NIKOLLA Cell

Phone was in contact with SUBJECT TELEPHONE 1 following DERVISHAJ's 12:23 a.m.

call with John Doe #1 on July 7, 2013 at the following approximate times: 3:56 a.m., 7:55 p.m.,

8:04 p.m., 8:25 p.m., 8:35 p.m., and 10:43 p.m.   Based on the timing of these calls, my

participation in the investigation, and my training and experience, I believe these calls related

to the gun incident.

---

[6]    Telephone records reveal that 718 Telephone Number 2 belongs to a pay phone located
in Astoria, New York, located approximately 0.6 miles from the Astoria Restaurant.

19.     At approximately 6:33 p.m. on July 7, 2013, LLAKATURA sent John Doe #1 a text message from SUBJECT TELEPHONE 2, which stated "U are in deep shit u know.   I dont want ur problems to become mine."   Telephone records further reveal that (1) SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 1:32 p.m., 3:12 p.m., 4:44 p.m., 4:51 p.m., 8:26 p.m., 9:05 p.m., and 10:01 p.m. on July 7, 2013; and (2) SUBJECT TELEPHONE 2 was used to call SUBJECT TELEPHONE 1 at approximately 9:49 p.m. on July 7, 2013.   Based on the timing of the above-described phone calls from DERVISHAJ to LLAKATURA, which preceded LLAKATURA's text message to John Doe #1, and my training and experience, I believe that DERVISHAJ informed LLAKATURA John Doe #1 had been threatened with a gun and that this incident was the "deep shit" LLAKATURA was referring to in his text message to John Doe #1.

20.     On or about July 8, 2013, at approximately 9:46 p.m.,[7] John Doe #1 called LLAKATURA on SUBJECT TELEPHONE 2, which call was consensually recorded.[8] A review of the recording reveals that, during this call, LLAKATURA asked John Doe #1 what happened.   John Doe #1 told LLAKATURA he did not know what to do and that "they" showed up with weapons.   LLAKATURA asked John Doe #1 where he was and John Doe #1

---

[7]     In a prior affidavit in support of an application for orders authorizing the disclosure of location data relating to SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2, sworn to by FBI Task Force Officer Joseph Chimienti on July 16, 2013 (hereinafter, the "July 16, 2013 Location Data Affidavit"), the start time of this call was mistakenly set forth as approximately 5:50 p.m.   The correct start time of the call is approximately 9:46 p.m.

[8]     All consensually recorded calls between John Doe #1 and LLAKATURA and DERVISHAJ set forth in this affidavit were consensually recorded and verified using an FBI system.

indicated he was in New Jersey. LLAKATURA advised John Doe #1 to stay in New Jersey and not to come to New York until tomorrow. LLAKATURA further advised John Doe #1 that he would be in Astoria tomorrow and would see what to do then.

21. Telephone records reveal that SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 1:42 p.m., 2:15 p.m., and 5:59 p.m. on July 8, 2013.

22. At approximately 1:08 a.m. on July 9, 2013, John Doe #1 received a text message on his mobile telephone from LLAKATURA, using SUBJECT TELEPHONE 2, which text message was viewed by law enforcement agents and which telephone records confirm was sent from SUBJECT TELEPHONE 2. The text message advised John Doe #1 to tell the manager of the Astoria Restaurant to be careful tomorrow and not to be by himself. Based on my participation in the investigation, and my training and experience, I believe this text message was meant to convey to John Doe #1 that DERVISHAJ and his associates intended to physically harm the manager of the Astoria Restaurant.

23. On or about July 9, 2013, at approximately 10:19 a.m., John Doe #1 received a text message on his mobile telephone from LLAKATURA, using SUBJECT TELEPHONE 2, asking John Doe #1 to meet him in Staten Island, New York. This text message has been viewed by law enforcement agents and telephone records confirm the time and sender of the text message. Thereafter, telephone records indicate that John Doe #1 spoke with LLAKATURA on SUBJECT TELEPHONE 2. According to John Doe #1, during their conversation, LLAKATURA provided John Doe #1 with an address in Staten Island at

which John Doe #1 could meet LLAKATURA and, further, that "they" had another "crew"

following John Doe #1 around and that they were "bad people."   Based on my participation in

the investigation, and my training and experience, I believe LLAKATURA used the term

"crew" to refer to DERVISHAJ and others working with him and, further, was attempting to

instill fear in John Doe #1 by (1) indicating that DERVISHAJ had additional associates

following John Doe #1; and (2) referring to DERVISHAJ and his associates as "bad people,"

which I believe was meant to convey that they were capable of violence.

24.     On or about the afternoon of July 9, 2013, John Doe #1 met with

LLAKATURA in Staten Island, New York, which meeting was physically surveilled by law

enforcement agents.[9] John Doe #1 advised that the following transpired at the meeting, in

substance and in part:

a.     LLAKATURA advised John Doe #1 that he was in a bad

situation and that the individuals extorting John Doe #1 were bad people who could not be

fought because they would hurt John Doe #1.

b.     LLAKATURA further advised that, on or about July 8, 2013,

DERVISHAJ came to LLAKATURA's residence with two friends, one of whom was an

individual LLAKATURA knew as "Altin,"[10] to discuss the amount of money they wanted

from John Doe #1.   LLAKATURA stated that DERVISHAJ wanted three months' payment

---

[9]     John Doe #1 was equipped with a recording device during this meeting, but the
recording device malfunctioned and, as a result, the meeting was not recorded.

[10]     In the July 16, 2013 Location Data Affidavit, the name of this individual was
mistakenly set forth as "Ardit."

17

from John Doe #1, for the three months the Astoria Restaurant had been open, totaling $12,000, by July 11, 2013.   LLAKATURA told John Doe #1 that if John Doe #1 did not pay, John Doe #1 would be physically harmed.   LLAKATURA further stated that the individuals extorting John Doe #1 had intended to wound John Doe #1 by shooting him on the evening of July 6, 2013.

   c. John Doe #1 told LLAKATURA that he could not come up with $12,000 by July 11, 2013, and would only be able to pay $4,000 by that date.   LLAKATURA stated that he would speak with "them" and get back to John Doe #1.

   25. At approximately 7:48 p.m. on July 9, 2013, LLAKATURA sent a text message from SUBJECT TELEPHONE 2 to John Doe #1 stating "U have no problem do ur things," which text message was reviewed by law enforcement agents and which telephone records confirm was sent from SUBJECT TELEPHONE 2.   Based on my participation in the investigation, and my training and experience, I believe this text message was meant to convey to John Doe #1 that LLAKATURA had spoken with DERVISHAJ regarding John Doe #1's ability to make a payment (as LLAKATURA indicated he would at the conclusion of his July 9, 2013 meeting with John Doe #1) and that John Doe #1 and/or his employees would not be physically harmed that evening.

   26. Telephone records indicate that, at approximately 10:41 p.m. on July 9, 2013, John Doe #1 received a telephone call on his mobile phone from SUBJECT TELEPHONE 2.   According to John Doe #1, during this phone call, LLAKATURA indicated that he was a few blocks away from the Astoria Restaurant and was going to pass by, which

LLAKATURA thereafter did.   Video surveillance footage in and around the Astoria

Restaurant shows LLAKATURA arriving at the Astoria Restaurant at approximately 10:44

p.m. and thereafter speaking with John Doe #1 outside the Astoria Restaurant.   John Doe #1

related that the following transpired during his meeting with LLAKATURA, in substance and

in part:

       a.     LLAKATURA related that two Albanian men had come to see

LLAKATURA and told LLAKATURA that they had been sent by DERVISHAJ.

       b.     According to LLAKATURA, one of the Albanian men then

called DERVISHAJ from his mobile telephone and handed the phone to LLAKATURA.

LLAKATURA indicated that DERVISHAJ told LLAKATURA that John Doe #1 must pay

DERVISHAJ $6,000 by July 11, 2013 and another $6,000 by August 15, 2013, otherwise

DERVISHAJ would break John Doe #1's legs.   LLAKATURA offered to loan John Doe #1

$2,000 towards the $6,000 payment to DERVISHAJ due on July 11, 2013.

      27.     Telephone records reveal that (1) SUBJECT TELEPHONE 1 was used

to call SUBJECT TELEPHONE 2 at approximately 3:42 p.m., 3:53 p.m., 9:06 p.m., and 9:09

p.m. on July 9, 2013; and (2) SUBJECT TELEPHONE 2 was used to call SUBJECT

TELEPHONE 1 at approximately 6:50 p.m., 8:32 p.m., 8:59 p.m., 9:00 p.m., and 11:39 p.m.

on July 9, 2013.   Based on the timing of these calls, my participation in the investigation, and

my training and experience, I believe that (1) during the calls that took place before

LLAKATURA's 10:44 p.m. meeting with John Doe #1, DERVISHAJ and LLAKATURA

likely discussed the terms of John Doe #1's required payments to DERVISHAJ; and/or (2)

during the 11:39 p.m. call following LLAKATURA's meeting with John Doe #1,

LLAKATURA likely informed DERVISHAJ of what transpired during LLAKATURA's

meeting with John Doe #1.

28.     On or about July 10, 2013 at approximately 6:08 p.m.,[11] John Doe #1

called LLAKATURA on SUBJECT TELEPHONE 2, which call was consensually recorded.

A review of the recording reveals that, during this phone call, LLAKATURA asked John Doe

#1 whether John Doe #1 would make the cash payment to DERVISHAJ himself or whether

LLAKATURA should do so instead.   John Doe #1 stated that he wanted to meet

DERVISHAJ face-to-face.   LLAKATURA stated that he also wanted to be present at the

meeting with DERVISHAJ and advised John Doe #1 to meet LLAKATURA the next day in

the afternoon.

29.     At approximately 7:11 p.m.[12] on July 10, 2013, John Doe #1 called

SUBJECT TELEPHONE 2 and spoke with LLAKATURA, which call was consensually

recorded.   A review of the recording reveals that, during the phone call, LLAKATURA and

John Doe #1 discussed whether to meet with DERVISHAJ later that night or the next day.

LLAKATURA told John Doe #1 that he would provide him with a $2,000 loan when they met,

but that John Doe #1 would need to provide the rest of the money ($4,000).   LLAKATURA

---

[11]     In the July 16, 2013 Location Data Affidavit, the start time of this call was mistakenly
set forth as approximately 2:14 p.m. The correct start time of the call is approximately 6:08
p.m.

[12]     In the July 16, 2013 Location Data Affidavit, the start time of this call was mistakenly
set forth as approximately 3:23 p.m. The correct start time of the call is approximately 7:11
p.m.

and John Doe #1 ultimately agreed to meet the next day after LLAKATURA got off from work, in Astoria, New York.

30.     Telephone records reveal that (1) SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 4:57 p.m., 5:02 p.m., 5:05 p.m., and 7:32 p.m. on July 10, 2013; and (2) SUBJECT TELEPHONE 2 was used to call SUBJECT TELEPHONE 1 at approximately 5:54 p.m. and 6:15 p.m.[13] on July 10, 2013.

31.     On or about July 11, 2013 at approximately 11:33 a.m.,[14] John Doe #1 called SUBJECT TELEPHONE 2 and spoke with LLAKATURA, which call was consensually recorded.   A review of the recording reveals that, during the call, John Doe #1 expressed concern over his safety and asked LLAKATURA if he could meet with LLAKATURA.   LLAKATURA told John Doe #1 that they could meet later in the day, five minutes before the meeting with DERVISHAJ, to go over any concerns John Doe #1 had. LLAKATURA stated that he would make sure nothing happened to John Doe #1 during the meeting with DERVISHAJ.   LLAKATURA ultimately agreed to meet with John Doe #1 briefly in Staten Island, New York.

32.     On or about the afternoon of July 11, 2013, John Doe #1 met with LLAKATURA in Staten Island, New York, which meeting was consensually recorded.   John Doe #1 advised that the following transpired during the meeting, in substance and in part:

---

[13]     In the July 16, 2013 Location Data Affidavit, the end time of this call (6:20 p.m.) was inadvertently listed as the start time of the call.   The correct start time of the call is 6:15 p.m.

[14]     In the July 16, 2013 Location Data Affidavit, the start time of this call is mistakenly set forth as approximately 7:37 a.m. The correct start time of the call is approximately 11:33 a.m.

21

a. LLAKATURA told John Doe #1 that John Doe #1 could open up a club with DERVISHAJ. LLAKATURA advised that the club would be in John Doe #1's name, but DERVISHAJ would be a partner in the club. In the event this transpired, LLAKATURA told John Doe #1 that for every $2,000 John Doe #1 made from the club, John Doe #1 would have to give DERVISHAJ $1,000.

b. LLAKATURA stated that he had spoken with DERVISHAJ and that, as long as John Doe #1 paid DERVISHAJ, John Doe #1 would be fine.

c. LLAKATURA stated that DERVISHAJ would search John Doe #1 when they met with DERVISHAJ later that night and that DERVISHAJ expected another $6,000 payment by August 15, 2013.

d. While discussing possible options with John Doe #1, LLAKATURA told John Doe #1 that if he went into witness protection, DERVISHAJ and his associates would hurt members of John Doe #1's family who reside in another state, and asked John Doe #1 what type of car John Doe #1's brother-in-law has.

33. A review of the recording of John Doe #1's meeting with LLAKATURA on the afternoon of July 11, 2013 corroborates John Doe #1's account of what transpired. In addition, the recording reveals that, during the meeting, LLAKATURA told John Doe #1 that DERVISHAJ would not call John Doe #1 because DERVISHAJ is worried that John Doe #1 might have the police involved. LLAKATURA further indicated that he told DERVISHAJ to search John Doe #1 when they meet.

22

34.     On or about the evening of July 11, 2013, John Doe #1 met with LLAKATURA in Astoria, New York, which meeting was physically surveilled and partially consensually recorded.   According to the physical surveillance, John Doe #1 entered LLAKATURA's vehicle at approximately 6:03 p.m.   John Doe #1 advised that the following transpired during the meeting, in substance and in part:

    a.     John Doe #1 entered LLAKATURA's vehicle, at which point LLAKATURA handed John Doe #1 $2,000 in cash.   LLAKATURA subsequently received a telephone call on his mobile phone from DERVISHAJ, during which John Doe #1 overheard DERVISHAJ telling LLAKATURA where to meet him.   Following this phone call, LLAKATURA told John Doe #1 to take everything out of his pockets and leave these items in LLAKATURA's vehicle.   LLAKATURA and John Doe #1 then proceeded to meet with DERVISHAJ in Astoria, New York on an isolated street corner.[15]

    b.     At the start of the meeting with DERVISHAJ, DERVISHAJ searched both John Doe #1 and LLAKATURA.   DERVISHAJ then asked John Doe #1 what he had to say for himself.   LLAKATURA told John Doe #1 to give DERVISHAJ the money, at which point DERVISHAJ gestured to slow down and asked John Doe #1 to get into DERVISHAJ's car – the Chevy Malibu – with DERVISHAJ.   LLAKATURA remained outside the Chevy Malibu.

---

[15]     A review of the recording corroborates John Doe #1's account of what transpired. The recording captures DERVISHAJ's voice telling LLAKATURA where they should meet.   In addition, telephone records indicate that SUBJECT TELEPHONE 2 received an incoming call from SUBJECT TELEPHONE 1 at approximately 6:07 p.m. on July 11, 2013.

c.      While inside the Chevy Malibu, DERVISHAJ told John Doe #1 that he was lucky the other night and that John Doe #1 and the manager of the Astoria Restaurant should thank LLAKATURA.   John Doe #1 then handed DERVISHAJ $6,000 in cash,[16] at which point DERVISHAJ inquired about the rest of the money.   John Doe #1 indicated that he was told he had until August 15, 2013 to come up with the rest of the money.

d.      DERVISHAJ stated that, in the future, he would give John Doe #1 his telephone number, which John Doe #1 could use to contact DERVISHAJ, in the event John Doe #1 needed protection and, also, to make payments to DERVISHAJ.   John Doe #1 then left the meeting location with LLAKATURA.

35.      On or about August 12, 2013, at approximately 5:06 p.m., John Doe #1 called SUBJECT TELEPHONE 2, which call was consensually recorded. A review of the recording reveals that, during the call, John Doe #1 informed LLAKATURA that DERVISHAJ had not given John Doe #1 his phone number yet and that he was worried that DERVISHAJ would come by unannounced seeking payment and John Doe #1 would "have nothing."   John Doe #1 further asked LLAKATURA if he had seen DERVISHAJ around.   In response, LLAKATURA implied that he had not seen or spoken with DERVISHAJ in a week, stating, in sum and substance, "It's been a week since I have been to Astoria."   With respect to DERVISHAJ not having given John Doe #1 his number, LLAKATURA responded, in sum and substance, "So what?   Why do you give a fuck?   So he comes on the 16th, 17th, or the

---

[16]      The government provided John Doe #1 with $4,000 in cash to provide to DERVISHAJ in advance of the July 11, 2013 meeting.

20th, why do you give a fuck?"  LLAKATURA further stated, in sum and substance, "I don't

want to call him, man.  Not only that, but they change their numbers the same way they

change their whores.  [UI]  If I go today to Astoria and happen to see anyone, okay.  If I

don't see [UI] whenever.  You should not give a fuck.  That's right.  If he wants to.  If he

doesn't want to, fuck him.  Okay?"

  36. A few minutes thereafter on the same day, at approximately 5:12 p.m.,

DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 471) from

(917) 500-5727, a mobile telephone used by LLAKATURA and subscribed to by "TAPAS

SINY" at 661 Bay St., Staten Island, New York 10304-3828.  An establishment called Tapas

Restaurant and Bar is located at 661 Bay Street in Staten Island and is owned by a corporation

of which LLAKATURA's father is a principal.  During the phone call, LLAKATURA[17]

appears to speak in code, referring to John Doe #1 as a woman who is asking whether she

needs to give DERVISHAJ a Valentine's Day gift the day after Valentine's day (i.e., the 15th),

to inform DERVISHAJ of the phone call he received from John Doe #1 just moments earlier:

  BL: I am taking care of your problems now too, fucking shit!

  RD: Why, brother?

  BL: You want to fuck her and you—

  RD: Hey uh, I am not alone here.

  BL: Oh, I am sorry.  And you don't give your phone number.

  RD: Why?  Were there problems?

---

[17] LLAKATURA has been identified as the user of (917) 500-5727 by recognition of his voice by comparison with other known recordings of LLAKATURA.

BL:    No, there have not been any.   But said, "Will I give a gift for Valentine's Day or not?   Or what?"

RD:    I will give it this time when we meet.   I will give the number too.

BL:    Hey don't . . . Valentine's is on February 14th.   [She] said she will not celebrate it on the 15th because she said the problem is that . . . I am sorry, who is listening there?   Maybe will not give it at all.

RD:    [Laughs]

BL:    [Laughs]

RD:    Oh, he wants to on the 14th?

BL:    Oh I don't know.   Now you . . . She wants you and now you're like this and that.

RD:    Huh.

BL:    I have my own problems with my own stuff.   Now I have to take care of problems.

RD:    [Laughs]

BL:    You're giving me a headache.   Even the little gray hair I have left will fall off.

RD:    Yes, yes.

BL:    Hey pretend you pass by, not today cause it will look bad, [UI] tomorrow.

RD:    Tomorrow?

BL:    And leave a number so that whenever she feels like making love to you—

RD:    Yes.

BL:    Do you understand?

36.   According to John Doe #1, on or about August 14, 2013, at approximately 3:45 p.m., John Doe #1 received a telephone call from DERVISHAJ, calling from phone number (646) 894-7578.   According to John Doe #1, DERVISHAJ provided him with (646) 894-7578 as his phone number (hereinafter, the "646 DERVISHAJ Number").

26

37.     On August 16, 2013, at approximately 4:18 p.m., John Doe #1 called the 646 DERVISHAJ Number, which call was consensually recorded.   A review of the recording reveals that, during the call, John Doe #1 asked DERVISHAJ if he would come to the Queens Pizzeria to receive an extortion payment from John Doe #1.   DERVISHAJ stated he was in New Jersey, but would call John Doe #1 when he was back in New York.   At approximately 7:04 p.m., John Doe #1 called the 646 DERVISHAJ Number again, which call was consensually recorded.   A review of the consensual recording reveals that, during the call, DERVISHAJ indicated he had returned from New Jersey and would go meet John Doe #1 at the Queens Pizzeria.   Thereafter, an FBI surveillance team followed DERVISHAJ as he drove from his residence in Queens to the Queens Pizzeria.   According to the surveillance team, DERVISHAJ drove past the Queens Pizzeria, but did not exit his vehicle and enter the pizzeria.

38.     At 8:14 p.m. the same evening, DERVISHAJ placed an outgoing call on SUBJECT TELEPHONE 1 (Session 563) to SUBJECT TELEPHONE 2.   During the call, DERVISHAJ appears to advise LLAKATURA that he has turned off his "other phone" because his meeting with John Doe #1 may be a "set-up."

RD:     I closed the other phone.

BL:     Who?

RD:     Me, me.

BL:     Why?

RD:     Eh, it's set up.   Okay?   We'll meet.   Bye.

39.     Based on my training, experience and participation in the investigation, I believe (1) the "other phone" is the 646 DERVISHAJ Number and (2) the term "set-up" is an indication that DERVISHAJ suspected his vehicle was being followed by law enforcement agents.

40.     At 9:02 p.m. that evening, DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 566) from SUBJECT TELEPHONE 2.   During the call, LLAKATURA asked DERVISHAJ where he was.   DERVISHAJ stated that he had just stopped at "the plaza" on 29th Street and 30th Avenue for coffee with his girlfriend. LLAKATURA stated that he was on his way and asked if he could meet DERVISHAJ in five minutes.   DERVISHAJ agreed.

41.     At approximately 9:07 p.m. that evening, John Doe #1 called the 646 DERVISHAJ Number, which call was consensually recorded.   The call went to voicemail. A review of the consensual recording reveals that John Doe #1 left DERVISHAJ a message asking DERVISHAJ whether he was coming and indicating that DERVISHAJ should call him, as he would be leaving the Queens Pizzeria.   At 9:15 p.m., DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 567) from SUBJECT TELEPHONE 2. During the call, LLAKATURA and DERVISHAJ advised each other where to meet.

42.     At 9:17 p.m., DERVISHAJ placed an outgoing call on SUBJECT TELEPHONE 1 (Session 568) to SUBJECT TELEPHONE 2.   During the call, DERVISHAJ apologized for making LLAKATURA wait and the two again arranged to meet without others present:

RD:     You will wait five minutes.   Huh?   I am sorry to make you wait.

BL:     Oh, okay.

RD:     My girlfriend went somewhere and I have no one who can stay at the table.

BL:     Uh-huh.

RD:     I will be there.   Sorry to make you wait, huh?

BL:     Oh yeah, oh.   Are you alone at the table?

RD:     Yeah, now I am alone at the table.   She went to get her friend.   As soon as we sat down, she called her.

28

BL:     So she went to get her there?

RD:     Eh.

BL:     You meet me here in the corner.   What's the problem?

RD:     Which corner?

BL:     Here, I am close by.

RD:     Where are you?   I don't see you.

BL:     At the end of the street.

RD:     Where at the end of the street?

BL:     [UI] plaza, yeah, yeah behind.   Turn around.   Eh, yeah.

RD:     Oh there.

43.     Given what transpired during this call, along with my training, experience and participation in the investigation, I believe that DERVISHAJ and LLAKATURA met briefly at the end of the call and discussed John Doe #1 and DERVISHAJ's suspicion that he was being followed by law enforcement.

44.     Several minutes later, at approximately 9:25 p.m., John Doe #1 called SUBJECT TELEPHONE 2, which call was consensually recorded.   The call went to voicemail.   A review of the consensual recording reveals that John Doe #1 left LLAKATURA a message asking LLAKATURA to call him.   At approximately 9:30 p.m., John Doe #1 received a call from SUBJECT TELEPHONE 2.   According to John Doe #1, during the call, John Doe #1 told LLAKATURA, in sum and substance, that DERVISHAJ was supposed to pick up the extortion payment, but now was not answering his phone and John Doe #1 did not know what to do.   LLAKATURA asked John Doe #1 where he was and whether he would come to Astoria.   John Doe #1 indicated he would come to Astoria after work.   LLAKATURA asked John Doe #1 to call him when he was in Astoria.

29

45.  Approximately half an hour later, at 9:59 p.m., DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 569) from SUBJECT TELEPHONE 2. During the call, LLAKATURA appears to inform DERVISHAJ, in coded language, about his 9:30 p.m. call with John Doe #1, described above:

BL:  That bitch called me.

RD:  Uh-huh.

BL:  You know for what.

RD:  Yes.

BL:  Said why, meaning "why she doesn't want to go out with me?"  Do you understand?  For that—

RD:  Uh-huh.

BL:  I said if there was anything, I will meet you instead of him.

RD:  Uh-huh.  What did he say?

BL:  Yeah.

RD:  He said okay?

BL:  Yeah.

RD:  Okay, okay.

BL:  Okay.  If there is anything then.  Just look, you know how—

RD:  Yeah, yeah.

BL:  Okay?

RD:  I'll check things myself.

BL:  Okay.  Look, if she has information that she is being followed, good bye—

RD:  Uh-huh.

BL:  Do it like I told you and tell me right away.

RD:  Okay.

30

> BL:     Okay?  Slowly.

Based on my training, experience and participation in the investigation, I believe (1)
LLAKATURA's use of the term "that bitch" is a reference to John Doe #1; (2) LLAKATURA
told DERVISHAJ on this call that he had suggested to John Doe #1 that John Doe #1 could
meet with LLAKATURA, instead of DERVISHAJ to make the extortion payment and John
Doe #1 was amenable to that arrangement; and (3) at the end of the call, LLAKATURA
advised DERVISHAJ to take precautions regarding possible law enforcement surveillance.

46.     Half an hour later, at approximately 10:28 p.m., John Doe #1 received
three text messages sent from SUBJECT TELEPHONE 2 indicating that John Doe #1 should
meet LLAKATURA at a street corner in Astoria, New York.  At approximately 10:42 p.m.,
John Doe #1 called SUBJECT TELEPHONE 2, which call was consensually recorded.  A
review of the recording reveals that, during the call, John Doe #1 expressed frustration that
DERVISHAJ did not come to the Queens Pizzeria and asked LLAKATURA what was going
on:

> JD#1:  I am still at the pizzeria.
>
> BL:     Uh-huh.
>
> JD#1:  [UI]   What, what, what is going on with [UI]?
>
> BL:     Huh?
>
> JD#1:  What is going to happen with him?   I don't get what's going on.
>
> BL:     Come here.  Come and meet with me.  I told you.
>
> JD#1:  I am throwing up and stuff, fucking shit.
>
> BL:     Who?
>
> JD#1:  They're giving me a heart attack *man*.  I don't know what is going to
> happen.
>
> BL:     Come, come.

JD#1:  Huh?

BL:    I am saying come meet me here.

JD#1:  What's going to happen?   I don't know what's going to happen with
       this.

BL:    I am telling you to come and meet with me.   Do you hear me?   Don't
       talk on the phone.

JD#1:  Uh-huh.

BL:    *Okay?*[18]

JD#1:  [UI]

BL:    *Alright, bye.*

47.    At approximately 10:51 p.m., John Doe #1 received two text messages
from SUBJECT TELEPHONE 2, stating "hello" and "just come."   John Doe #1 called
SUBJECT TELEPHONE 2 at approximately 10:51 p.m., which call was consensually
recorded.   The call went to voicemail.   A review of the recording reveals that John Doe #1
left a message indicating he was not going to meet LLAKATURA that evening as he was not
feeling well, but they could meet "some other day."   At approximately 11:14 p.m., John Doe
#1 received a phone call from SUBJECT TELEPHONE 2, which he did not answer.   At
approximately 11:40 p.m., John Doe #1 called SUBJECT TELEPHONE 2, which call was
consensually recorded.   A review of the recording reveals that, during the call,
LLAKATURA made it appear as though he had not been in contact with DERVISHAJ that
evening and was not involved in DERVISHAJ's extortion activities.   He further feigned
concern for John Doe #1:

BL:    What has happened *man*?

JD#1:  What?   Nothing has happened.   Do I know what happens at 12
       midnight?

---

[18]   Words in italics were said in English.

32

BL:     Who?

JD#1:   What?   For what should I come there at 12 midnight?   [overlap]   He was supposed to, he was supposed to come and meet me but did not come.   He doesn't pick up the phone or anything.

BL:     I don't know *man* what's up.   I thought that there was something going on with you.

JD#1:   There is nothing going on with me.   I am okay.   But because of that—

BL:     I told you, you should not give a fuck.   When it happens— Why do you worry?   You're a moron.   I thought that maybe something happened to you and that's why I told you to come.

JD#1:   *No man*, nothing has happened to me.   But I waited—

BL:     Why do you give a fuck?

JD#1:   —I waited for the motherfucker and that—   I've been carrying all that money with me for that motherfucker.

BL:     Go home man, fuck it.   Go relax at home.   You should not give a fuck.   And that's it.

JD#1:   Uh-huh.

BL:     I thought you called because something happened *man*.

JD#1:   *No man*, nothing has happened.   Because of that, because he did not come and—my leg is a mess *fucking* I had surgery on it three days ago.   And that motherfucker "I will come, I will come" and I don't understand what's happening.

BL:     And you give a fuck!   You're a moron.   You talked about it once and now you should not give a shit.   If he wants, if not, all of them can fuck themselves.

JD#1:   Uh-huh.

BL:     I thought— Fucking shit.   I thought there was something wrong and that's why I said come.   That's why.

JD#1:   No, it's nothing like that, no.

Based on my training, experience and participation in the investigation, I believe that

LLAKATURA began the conversation by inquiring why John Doe #1 was unwilling to meet

with LLAKATURA that evening and, throughout the conversation, pretended he only wanted

to meet with John Doe #1 out of concern that something bad had happened to John Doe #1 in relation to John Doe #1's scheduled extortion payment to DERVISHAJ.

48.     On August 17, 2013, at 12:20 p.m., DERVISHAJ placed an outgoing call on SUBJECT TELEPHONE 1 (Session 570) to SUBJECT TELEPHONE 2.   During the call, LLAKATURA appears to update DERVISHAJ regarding his last phone conversation the night before with John Doe #1, described above in paragraph 47:

> RD:   Anything new?
>
> BL:   Nothing really, the same.   He told me, "I'm waiting, waiting.   What's next?   Yes, no, or what—"
>
> RD:   Uh-huh.
>
> BL:   "if he wants or what he does not want, or what," you know?   That's how we left it.
>
> RD:   Uh-huh.   Are you going to be long?
>
> BL:   Not sure.   Why?
>
> RD:   If we could meet.
>
> BL:   Okay, when I come back.

Based on my training, experience and participation in the investigation, I believe that during this call LLAKATURA informed DERVISHAJ that John Doe #1 was anxious to know whether or not DERVISHAJ would pick up the extortion payment and that DERVISHAJ and LLAKATURA agreed to meet later to discuss the situation.

49.     Thereafter, on August 17, 2013, at approximately 4:45 p.m. and 5:13 p.m., John Doe #1 received two calls from the 646 DERVISHAJ Number, which John Doe #1 did not answer.   At 6:04 p.m., DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 591) from SUBJECT TELEPHONE 2.   During the call,

34

DERVISHAJ appears to complain to LLAKATURA that John Doe #1 is not answering his

phone calls:

> RD:   I called him, I called him twice.   He doesn't pick up the phone.
>
> BL:   Uh-huh, okay.
>
> RD:   I don't like it at all.
>
> BL:   Huh?
>
> RD:   I don't like it that he is not picking up the phone.
>
> BL:   [UI] the friend [UI].
>
> RD:   Your friend?
>
> BL:   Yeah.
>
> RD:   Huh.
>
> BL:   Because it's the last [UI].
>
> RD:   But why, brother?
>
> BL:   For no reason.   He owes you.   He is afraid because he owes money and that's it.
>
> RD:   Okay then.
>
> BL:   Okay?
>
> RD:   Okay then, we'll talk.
>
> BL:   Bye.
>
> RD:   Call me for everything.

50.   Thereafter, John Doe #1 received four more incoming calls from the 646

DERVISHAJ Number at the following approximate times on August 17, 2013: 7:59 p.m., 8:03

p.m., 9:15 p.m., and 9:28 p.m.   John Doe #1 did not answer any of these calls.

51.   On August 18, 2013, at approximately 11:51 a.m., John Doe #1 received

an incoming call from the 646 DERVISHAJ Number, which he did not answer.   At

approximately 12:27 p.m., John Doe #1 called the 646 DERVISHAJ Number, which call was

consensually recorded.   A review of the recording reveals that, during the call, DERVISHAJ complained that John Doe #1's phone did not work:

RD:      Your phone doesn't work?

JD#1:    But I have also not been feeling well.   I have been throwing up and stuff.

RD:      *Okay.*

JD#1:    What are you doing?

RD:      Not much.

JD#1:    I waited for you on Friday *man.*

RD:      Huh?

JD#1:    I am saying that I waited for you on Friday.   You did not come.

RD:      *Yeah* I did not come because I was busy.

JD#1:    Uh-huh.   When will you come now?

RD:      Huh?

JD#1:    I am saying, when will you come?

RD:      When will I come now?   God willing when I have time I will come and meet you, *okay*?

JD#1:    *Alright.*   I come back tomorrow, if so—

RD:      Okay, good.   God willing.

JD#1:    Good night then.   Ciao.

Based on my training, experience and participation in the investigation, I believe that during this call, John Doe #1 asked DERVISHAJ why he did not show up to receive the $6,000 extortion payment from John Doe #1 on Friday, August 16, 2013 and DERVISHAJ lied to John Doe #1 when he indicated that he was simply "busy."

52.      Thereafter, at 12:46 p.m. on August 18, 2013, DERVISHAJ placed an outgoing call on SUBJECT TELEPHONE 1 (Session 600) to SUBJECT TELEPHONE 2.

During the brief call, DERVISHAJ and LLAKATURA indicated that they would speak on another phone. Based on their training, experience and participation in the investigation, I believe DERVISHAJ subsequently spoke to LLAKATURA using an unmonitored telephone to update LLAKATURA on his phone call with John Doe #1.

  53. On or about August 20, 2013 at approximately 9:40 p.m., John Doe #1 met with LLAKATURA in Astoria, New York to make an extortion payment, which meeting was consensually recorded. A review of the recording reveals that at the beginning of the meeting, LLAKATURA asked John Doe #1 whether he had his phone with him. John Doe #1 stated that he left his phone in his car. LLAKATURA then stated "come here, open your arms," at which point, according to John Doe #1, LLAKATURA patted John Doe #1 down. The recording further reveals that, during the meeting, LLAKATURA told John Doe #1, in sum, substance and in part, that (1) DERVISHAJ told LLAKATURA that the night DERVISHAJ was supposed to meet John Doe #1 at the pizzeria, DERVISHAJ was followed by "two FBI cars;" (2) DERVISHAJ suspected he was followed because of John Doe #1; and (3) LLAKATURA explained to DERVISHAJ that John Doe #1 would not go to law enforcement because John Doe #1 has family in the United States and Albania. LLAKATURA further warned John Doe #1 that "they are motherfuckers" and that "if something happens to him [DERVISHAJ], fuck it, they are animals." LLAKATURA also reported that DERVISHAJ said "he will not go to jail" and that John Doe #1 should know that DERVISHAJ will not "just let it go" if something happens to DERVISHAJ. After John Doe #1 denied any involvement with law enforcement, LLAKATURA offered to accept John Doe #1's extortion payments going forward if John Doe #1 was afraid to pay DERVISHAJ himself. During the meeting, LLAKATURA accepted a $6,000 payment from John Doe #1[19] and told

---

[19] The government provided John Doe #1 with $6,000 in cash to provide to LLAKATURA in advance of the August 20, 2013 meeting.

John Doe #1 that he would not have any problems with DERVISHAJ since he was making payments. Throughout the conversation, LLAKATURA expressed concern about getting involved with DERVISHAJ, indicating that he could lose his job or end up in jail by receiving phone calls from DERVISHAJ.

54. Based on my training, experience and participation in the investigation, I believe LLAKATURA used this conversation to convey threats of violence to John Doe #1 and his family if John Doe #1 reported the extortion to law enforcement, while at the same time attempting to appear as though he was only involved in the extortion to help John Doe #1, at great personal risk to himself.

55. On September 16, 2013, at approximately 9:17 p.m., video surveillance from the pole camera installed outside of the Queens Pizzeria captured NIKOLLA entering the Queens Pizzeria. According to John Doe #1, after entering the Queens Pizzeria, NIKOLLA, in sum and substance, asked John Doe #1 for another payment and John Doe #1 told NIKOLLA that he would have the money in two days, namely, on September 18, 2013. NIKOLLA then told John Doe #1 that he needed to make a call. Video surveillance from the pole camera captured NIKOLLA leaving the Queens Pizzeria. Moments later, SUBJECT TELEPHONE 1 received an incoming call from 917-391-3326, a telephone that I believe is used by NIKOLLA (the "NIKOLLA 917 TELEPHONE").[20] After the call was placed, NIKOLLA went back into John Doe #1's restaurant. Video surveillance footage from cameras inside the Queens Pizzeria show NIKOLLA inside the Queens Pizzeria speaking with John Doe #1 both before and after the telephone call to SUBJECT TELEPHONE 1. According to John Doe #1, when NIKOLLA came back inside the Queens Pizzeria, he informed John Doe #1 that he would be back in two days and that John Doe #1 should not call

---

[20] Because interception had not yet begun, no conversations on the SUBJECT TELEPHONES were recorded.

him.   Video surveillance from the pole camera again captured NIKOLLA leaving the Queens

Pizzeria, and moments later, SUBJECT TELEPHONE 1 received another incoming call from

the NIKOLLA 917 TELEPHONE.   I believe that the NIKOLLA 917 TELEPHONE is being

used by NIKOLLA based on the timing of the calls to SUBJECT TELEPHONE 1 immediately

following NIKOLLA's conversations with John Doe #1, as well as the fact that the NIKOLLA

917 TELEPHONE was seen on an advertisement for an escort service that I believe, based on

my training, experience and participation in the investigation, is operated by NIKOLLA.

56.   On September 18, 2013, at approximately 4:19 p.m., NIKOLLA, using

SUBJECT TELEPHONE 3 (Session 277), placed an outgoing telephone call to DERVISHAJ

on SUBJECT TELEPHONE 1.   During the call, NIKOLLA informed DERVISHAJ that he

was going to visit John Doe #1 at 8:30 that evening because John Doe #1 had told him "two

days."   Surveillance of John Doe #1's restaurant revealed that NIKOLLA did not visit John

Doe #1 as expected.

57.   On September 19, 2013, at approximately 10:21 a.m., NIKOLLA placed

an outgoing telephone call on SUBJECT TELEPHONE 3 (Session 1059) to DERVISHAJ on

SUBJECT TELEPHONE 1.   During the call, the two discussed why NIKOLLA did not visit

John Doe #1:

DN:   My battery died, [UI] . . . was there for like an hour.   I waited for him
like an hour and a half.

[UI]

DN:   [UI], Astoria . . . [UI], I'm going tonight . . . I told him 2-3 days . . . do
you understand?

RD:   Okay, brother, because you had me worried, fuck his mother.

DN:   I swear my battery died.

RD:   I'm working; I'll talk to you later.

Based on my training, experience and my participation in the investigation, I believe that because NIKOLLA did not visit John Doe #1 on September 18, 2013 to collect an extortion payment from John Doe #1, as he had previously told DERVISHAJ he would, NIKOLLA made an excuse so that DERVISHAJ would not be upset with him.

58.     At 3:51 p.m. on September 19, 2013, DERVISHAJ received a call on SUBJECT TELEPHONE 1 from NIKOLLA using SUBJECT TELEPHONE 3.   During that call the following exchange occurred:

DN:     Should I go there sooner?   Should I go around 7 o'clock?

RD:     Go, but call him.

DN:     I don't have his number, don't know if he is there.   I'll call him on the phone.   Whatever you say.

RD:     Come meet me before you, you know.

DN:     Okay.

Based on my training, experience and participation in the investigation, I believe that during this call, NIKOLLA asked DERVISHAJ when he should go to John Doe #1's restaurant, and that DERVISHAJ asked to meet him in person before he collected extortion money from John Doe #1.

59.     Later that evening, at approximately 8:15 p.m., NIKOLLA went to John Doe #1's restaurant to collect the payment.   Video surveillance from the pole camera outside the Queens Pizzeria recorded NIKOLLA entering the Queens Pizzeria.   A review of a consensual recording of the meeting between John Doe #1 and NIKOLLA reveals that, during the meeting, NIKOLLA stated, "give me that money because I don't have too much time.   I have to go."   John Doe #1 then paid NIKOLLA $4,000.[21]

---

[21]     The government had previously provided John Doe #1 with the $4,000 payment he made to NIKOLLA.

60.    On October 11, 2013, at 6:32 p.m., John Doe #1 called SUBJECT TELEPHONE 2 (Session 4663).   During the call, John Doe #1 inquired about the upcoming extortion payment he owed and indicated that business had been slow.   LLAKATURA claimed did not know anything and could not do anything.   He further stated that he did not talk over the phone, but indicated he would be in Astoria later with a friend.

61.    On October 15, 2013, at 7:07 p.m., LLAKURA made an outgoing call using SUBJECT TELEPHONE 2 (Session 5326) to SUBJECT TELEPHONE 1.   During the call, DERVISHAJ inquired whether LLAKATURA had spoken with John Doe #1:

RD:    Ha-have you spoken to, to the friend?

BL:    Yes.   [pause]   Uh?

RD:    So I don't need to, to go and meet him?

BL:    No, no, it is necessary.   It is necessary.

RD:    It is necessary?

BL:    Yeah.   Wha, what did we agree on, at the beginning! Then…

RD:    Um-hum.

BL:    You know?

RD:    Ha, okay.   [pause]   Well then.

BL:    Okay?   Let me know if [UI].

RD:    Okay.   Okay Bye.

BL:    If she, she does not see how – what you are made of—

RD:    [Overlapping conversation]   Yeah, yeah.

BL:    -- she [UI] beautifully, understand?

RD:    Uh-huh.

BL:    Okay?

RD:    Okay.

BL:     And then, you know what to do.

RD:     Okay.   Okay, then.

62.     Based on my training, experience and participation in the investigation, it appears that LLAKATURA advised DERVISHAJ that, while he had already spoken to John Doe #1 (referred to in code as a female on the call), it was still necessary for DERVISHAJ to go see John Doe #1 to send a message to John Doe #1 that full and timely extortion payments must continue to be made.

63.     That same evening, at approximately 8:30 p.m., video surveillance from the pole camera outside the Queens Pizzeria captured DERVISHAJ entering the Queens Pizzeria.   While inside the Queens Pizzeria, DERVISHAJ spoke with John Doe #1, which conversation was consensually recorded.   According to John Doe #1, during the conversation, DERVISHAJ indicated he was upset with the way John Doe #1 had been acting and, in sum and substance, informed John Doe #1 that he should make the next extortion payment to LLAKATURA.

64.     On October 16, 2013, at approximately 8:30 p.m., John Doe #1 met with LLAKATURA in Queens, New York, which meeting was consensually recorded.   During the meeting, John Doe #1 provided LLAKATURA with a $4,000 extortion payment.[22]

EXTORTION OF OTHER VICTIMS

65.     As noted above, the Court-authorized wiretaps of SUBJECT TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 have revealed that DERVISHAJ, LLAKATURA and NIKOLLA also extort other victims, apart from John Doe #1, and that VJERI participates in the extortion conspiracy by regularly providing information to DERVISHAJ regarding current and potential extortion victims in Queens, New York.

---

[22]     The government provided John Doe #1 with the $4,000 payment before the meeting.

66.     For example, on August 8, 2013, at 3:08 p.m., DERVISHAJ received an incoming text message on SUBJECT TELEPHONE 1 (Session 294) from (646) 764-4283, a telephone number that I have determined, based on other intercepted calls, is used by DENIS NIKOLLA (hereinafter, the "646 NIKOLLA Number"). The text message stated "I met Pjeter. Andrea is hiding from us. He doesn't even go to work. I went to the real estate and they told me about it. I am going to take by force because they don't have any other way." Shortly thereafter, at 3:47 p.m., DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 301) from the 646 NIKOLLA Number. During the call, NIKOLLA elaborated on the text message he had sent, informing DERVISHAJ of threats he made to an extortion victim, who had apparently been attempting to avoid NIKOLLA. He also informed DERVISHAJ that he took the keys to the victim's business and was upset that someone – perhaps "the Italians" – had installed a "machine" in the business:

> DN:   I met Pjerin and told him to call him in my presence. I wanted to see if his phone was working or not.
>
> RD:   Uh-hum.
>
> DN:   [UI] They told me that they have left for Cyprus. [UI]  I go to the café and ask, "where is Andrea?"  "At the horses."  They told me that he has left for Cyprus.  Okay – he said.  Tell him to call me back or in 20 minutes I will be back and I want the money back.  You are cancelling the game.  That I know, [UI] the game – I don't want to scare the clients, but I want the money back.
>
> RD:   Uh-hum.  Who did you say those words to, Pjerin or [UI]?
>
> DN:   Not to Pjerin but to the old man.
>
> RD:   Yes.
>
> DN:   Do you know the man stays at the door?
>
> RD:   Huh.

43

DN:   I left by car now.   I left by car.

RD:   Uh-hum.

DN:   I went close to see what they were doing.   At the same time, they had brought a machine and have placed it close to the door.

RD:   What did they place, a machine?

DN:   Uh-hum. A [UI].

DN:   I don't know whose machine is that.

RD:   Okay.

DN:   Perhaps the Italians have brought the machine there to say, "Hey, it's our place."   Do you understand or no?

RD:   Uh-hum.

DN:   Anyway, I walked [UI] when I see them all going out one by one – going out.

RD:   Uh-hum

DN:   I find him walking, the gray hair man that is in charge, in charge.   What the fuck [UI].   Deni – he said – I told the customers to leave, otherwise they get scared and they don=t want to come back.   Alright – I said – you closed the door, I said, without asking me.   Give me the fucking keys.   I grabbed the keys of the shop.

RD:   Hmm.

DN:   Okay.   I have the keys in my car.   I told him, "When you want to open it, tell Andrea to call me."

RD:   Okay!

DN:   Be ready because perhaps somebody may come.   Do you understand? I don't like the machine being placed there at all.

67.     On August 8, 2013, at 4:01 p.m., DERVISHAJ received another incoming call on SUBJECT TELEPHONE 1 (Session 314) from the NIKOLLA 646 Number. During the call, NIKOLLA advised DERVISHAJ, in sum and substance, that (1) "some Italians" spoke with an individual named "Luci" and asked Luci if he knew anything about Luci's friend "trying to take our bread from us;" and (2) Luci responded that he is friends with NIKOLLA but had not spoken with NIKOLLA.   Based on my training, experience and participation in the investigation, I believe "bread" refers to money.   Thereafter, during the same call, NIKOLLA complained to DERVISHAJ that "he has told the Italians to install the machines there" and asked DERVISHAJ what he should do.   DERVISHAJ responded, stating "if they call you tell them that the place is not yours first of all – tell them – if you want to do things on our back, there is no problem, because you have machine all around the place and we shall start – and see who is going to be more capable, tell him."   Based on my training, experience and participation in the investigation, I believe the "machines" referred to in this call are gambling machines that appear to have been installed by members or associates of Italian organized crime in an establishment extorted by DERVISHAJ, NIKOLLA and LLAKATURA.

68.     On August 8, 2013, at 4:19 p.m., DERVISHAJ received a phone call on SUBJECT TELEPHONE 1 (Session 328) from SUBJECT TELEPHONE 4, which, as noted above, is subscribed to by VASILIKIA VJERI.[23]   Based on the content of other intercepted calls, I believe the user of SUBJECT TELEPHONE 4 is in fact VASILIKIA VJERI.   During the call, DERVISHAJ complained to VJERI that an individual had "called those people of the

---

[23]     Database checks reveal that VJERI was arrested on September 6, 2002 in Queens, New York and charged with Criminal Possession of a Firearm in the Third Degree, in violation of N.Y.P.L. § 265.02 (a Class D felony), and Possession of a Gambling Device, in violation of N.Y.P.L. § 225.30 (a Class A misdemeanor).   According to the arrest report, the firearm VJERI was charged with possessing was recovered during the execution of a search warrant and was loaded with ammunition.

machines" – an apparent reference to members and/or associates of Italian organized crime, to which VJERI responded, "I know, they placed them [the machines] last night." DERVISHAJ then informed VJERI that "they" want to meet and stated "why do you want to take our bread. Do you understand?" Based on my training, experience, participation in the investigation, and the content of this and other intercepted calls, it appears that VJERI may work at the establishment where the "machines" were placed, which she refers to as a "coffee shop" during the call. VJERI provides information to DERVISHAJ during intercepted calls as to what transpires at the establishment.

69.     On September 4, 2013, at 6:10 p.m., DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 1010) from SUBJECT TELEPHONE 4. During the call, VJERI informed DERVISHAJ that she had seen "Andrea," an individual who, as noted above, I believe, based on my training, experience and participation in the investigation, is one of DERVISHAJ's extortion victims:

VV:     Hello.   I forgot to tell you.

RD:     What?

VV:     [UI] Andrea came.

RD:     Oh?

VV:     Yes.

RD:     When?

VV:     And he went – I saw him. [UI] alone.   When I went to work I didn't want to call you on the phone. [UI] Forgot to tell you when we met, I'm forgetting everything.   When I went to work [UI] I saw Shopini [ph] and Hollywoodin [ph] by the door, outside, close to Nanaja [ph], by the table.

RD:     Yes.

VV:     I sat down with them too for five minutes.   So Andrea was walking past the corner, where the [UI] is.

RD:     Okay.

VV:     I didn't talk to him at all.   I turned my head.   He didn't talk with anyone.

RD:     Aha.

VV:     So Shopini [ph] was telling me that "he" went, the one who was partner's with him.

RD:     Aha.

VV:     He went [UI] far.

RD:     Aha.

VV:     So he told him we are waiting for Andrea to open it.

RD:     Okay.

VV:     Did you understand?

RD:     Okay, okay.

VV:     Good.   Okay, going to give you another phone; it came.

RD:     Okay, okay.

70.     Based on my training, experience and participation in the investigation, I also believe that, at the end of the excerpt of the call transcribed above, VJERI indicated she had obtained another telephone for DERVISHAJ's use.

71.     On October 2, 2013, at approximately 3:00 p.m., DERVISHAJ made an outgoing call on SUBJECT TELEPHONE 1 to SUBJECT TELEPHONE 4 (Session 1289). During the call, the following exchange took place:

RD:     What's going on?

VV:     Should I tell you over the phone or when I see you in the afternoon?

RD:     Why, what's going on?   Anything new?

VV:     Yes.

RD:    [UI] where?

VV:    The brother of the guy who lost the place [business].

RD:    Yeah.

VV:    [UI] is around.   You know what I mean, [UI].

RD:    Aha.  Do you understand?  [simultaneous talking]

VV:    The brother of the guy that called you on the phone many times, there by 24 [street/avenue].

RD:    Yes.

VV:    He opened it.

RD:    He opened 24th?

VV:    He opened it at 26.  I said that a man told me that he was going to get it but they gave it to someone.

RD:    Yes.

VV:    He's the one.   [UI]. I passed by and went to "old man," saw tables stacked up.  I didn't sit down, just passed by casually.

RD:    Aha.

VV:    He said it's true someone went and opened it, [UI] "mine."  It's true "he" opened it.

RD:    Okay.

VV:    I was thinking he was going to get the other one.

RD:    I know, I know.

VV:    The one at 24.

RD:    Okay good, because—

VV:    Okay, I'll see you in this afternoon.  I'll tell you more, [UI].  When you pass by here, you can pick up the food.

RD:     Okay.   Bye.

72.     On October 3, 2013, at approximately 2:03 p.m., DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 from SUBJECT TELEPHONE 4 (Session 1322).   During the conversation, VJERI told DERVISHAJ that they opened up both locations, including the one on 24th street.   At approximately 4:11 p.m., DERVISHAJ made an outgoing call using SUBJECT TELEPHONE 1 to the SUBJECT TELEPHONE 4 (Session 1328).   VJERI and DERVISHAJ again discussed the opening of a place, and DERVISHAJ asked VJERI to find out exactly who opened it up.   VJERI explained that she does not have anyone that she can send there, and that she does not want them to know that she sent someone there.   DERVISHAJ also asked VJERI about a location on 26th street, and VJERI responded that they opened that one as well.   DERVISHAJ inquired whether "they said anything" about anyone, and VJERI confirmed that they did not.   VJERI said that she is going to pass by the place to see if the Albanian is there.

73.     Several minutes later, at approximately 4:18 p.m., DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 from SUBJECT TELEPHONE 4 (Session 1330).   During that conversation, VJERI told DERVISHAJ that she just learned that "24" opened last night, and that they are closed during the day.   DERVISHAJ asked VJERI to find out if they opened it up with the guy from the Bronx or "Trisko," the other one.   VJERI stated that she did not know, but explained that they opened it up with the person that had it before.   DERVISHAJ told VJERI that the one that had it before put the machines in there, and that they were from the Bronx.   VJERI explained that she was unsure because she did not go

49

in herself and that the information came from others. Based on my training, experience and participation in the investigation, I believe that VJERI regularly provides information to DERVISHAJ regarding current and potential extortion victims. I believe that the foregoing calls demonstrate (1) VJERI's assistance to DERVISHAJ with his extortion activities, for example, by reporting that a new business opened up in the area where DERVISHAJ operates. DERVISHAJ indicated that he wanted additional information about the new businesses, including whether they were operating gambling machines, and (2) that VJERI is in a position to provide such information to DERVISHAJ.

74. There is therefore probable cause to believe that the REQUESTED INFORMATION will lead to evidence regarding the activities described above. The REQUESTED INFORMATION is necessary to assist law enforcement agents in conducting surveillance and to determine where members of the conspiracy meet and conduct their extortion activities.

## AUTHORIZATION REQUEST

75. WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing agents to obtain the REQUESTED INFORMATION for a period of 30 days. This Court has jurisdiction to issue the requested warrant and Order because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A). Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) . . . that — has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i)

76.     IT IS FURTHER REQUESTED that the Court direct the Service Providers to assist law enforcement by providing all information, facilities and technical assistance needed to ascertain the REQUESTED INFORMATION, and further direct the Service Providers to initiate a signal to determine the location of the SUBJECT TELEPHONES on the respective service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement officer serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the users of the SUBJECT TELEPHONES, for a period of 30 days.   Reasonable expenses incurred pursuant to this activity will be processed for payment by the FBI.

77.     IT IS FURTHER REQUESTED that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate the SUBJECT TELEPHONES outside of daytime hours.

78.     IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants to delay notice until 30 days after the collection authorized by the warrant has been completed or any extension thereof.   This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscribers or users of the SUBJECT TELEPHONES would seriously jeopardize the ongoing investigation, as such disclosure would give the targets of the investigation an opportunity to destroy evidence, harm or threaten victims or other witnesses, change patterns of behavior, notify confederates, and flee from and evade prosecution.   Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any

stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.

79.    IT IS FURTHER REQUESTED that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application including the application and search warrants.   I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organization, and not all of the targets of this investigation will be searched at this time.   Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

80.    IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, it is further requested that the Court issue an Order commanding T-Mobile, Sprint and MetroPCS Wireless, Inc., respectively, not to notify any

person (including the subscribers or customers of the accounts listed in the attached warrant)

of the existence of the attached warrants until further order of the Court.

Dated: Brooklyn, New York
October 17, 2013

SEAN OLSEWSKI
Special Agent
Federal Bureau of Investigation

Sworn to before me this
17th day of October, 2013

THE HONORABLE DORA L. IRIZARRY
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A-1

### Property To Be Searched

1.    The cellular telephone assigned call number (571) 337-7018, subscribed to by REDINEL DERVISHAJ, Dummy, Dummy, No City, New York 11102 ("SUBJECT TELEPHONE 1"), whose wireless service provider is T-Mobile, a company headquartered at 12920 SE 38th Street, Bellevue, WA 98006.

2.    Information about the location of SUBJECT TELEPHONE 1 that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

**ATTACHMENT B-1**
Particular Things to be Seized

      All information about the location of SUBJECT TELEPHONE 1 described in Attachment A-1 for a period of thirty days, during all times of day and night. "Information about the location of SUBJECT TELEPHONE 1" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephone described in Attachment A-1.

      To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 1 on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

      To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT A-2

Property To Be Searched

1.      The cellular telephones (1) assigned call number (347) 392-0246, subscribed

to by BESNIK LLAKATURA, 186 Jefferson Avenue, Staten Island, New York 10306

("SUBJECT TELEPHONE 2") and (2) assigned call number (516) 423-1788, subscribed to

by DENIS NIKOLLA, 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213,

("SUBJECT TELEPHONE 3"); both of which have wireless service provider Sprint, a

company headquartered at 6200 Sprint Parkway, Overland Park, KS 66251..

2.      Information about the location of SUBJECT TELEPHONE 2 and SUBJECT

TELEPHONE 3 that is within the possession, custody, or control of Sprint, including

information about the location of the cellular telephones if they are subsequently assigned

different call numbers.

**ATTACHMENT B-2**
Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 described in Attachment A-2 for a period of thirty days, during all times of day and night. "Information about the location of SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephones described in Attachment A-2.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT A-3

Property To Be Searched

1.      The cellular telephone assigned call number (917) 346-3581, subscribed to by VASILIKIA VJERI, 3270 Steinway Street, Astoria, New York 11103-4006 ("SUBJECT TELEPHONE 4"), whose wireless service provider is MetroPCS Wireless, Inc., a company headquartered at 2250 Lakeside Boulevard, Richardson, Texas 75082.

2.      Information about the location of SUBJECT TELEPHONE 4 that is within the possession, custody, or control of MetroPCS Wireless, Inc., including information about the location of the cellular telephone if it is subsequently assigned a different call number.

**ATTACHMENT B-3**
Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 4 described in Attachment A-3 for a period of thirty days, during all times of day and night. "Information about the location of SUBJECT TELEPHONE 4" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-3.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of MetroPCS Wireless, Inc., MetroPCS Wireless, Inc., is required to disclose the Location Information to the government. In addition, MetroPCS Wireless, Inc., must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with MetroPCS Wireless Inc.'s services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 4 on MetroPCS Wireless Inc.'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate MetroPCS Wireless, Inc., for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).